355 P.2d 133

Maria A. BARELA and Melquides Barela, Plaintiffs-Appellants,

v.

FRANK A. HUBBELL COMPANY, a corporation, and William Hubbell, Defendants-Appellees.

No. 6642.

Supreme Court of New Mexico.

Sept. 1, 1960.

Chavez & Cowper, Belen, Lorenzo A. Chavez, Arturo G. Ortega, Melvin L. Robins, Albuquerque, for appellants.

Keleher & McLeod, Russell Moore, Albuquerque, for appellees.

CHAVEZ, Justice.

This is a suit by appellants herein, the mother and father of Antonio Barela, who died while employed by appellee, Frank A. Hubbell Company, at the Company's "Y" Ranch in Catron County, New Mexico. In the first cause of action the father and mother ask damages, alleging that appellees negligently, wilfully and wantonly caused the body of their deceased son to be stuffed in the trunk of an automobile and transported, thereby resulting in mutilation. In the second cause of action the mother, Antonia Barela, prays damages, alleging that appellees knew, or should have known, that the condition in which the body would be when delivered to the family would be such as to shock a mother, and that when the body was brought to her home and exposed, it was in a bloody and mutilated condition. As a result she alleges that she suffered severe shock and injury to her nervous system, disability and mental anguish. The third cause of action by the father, Melquides Barela, is identical with the second cause of action and also asks damages. From a judgment dismissing the complaint at the conclusion of appellants' case, this appeal is taken.

The facts briefly are as follows. Antonio Barela died from an undetermined cause

while working as a sheepherder for appellee, Frank A. Hubbell Company, at its ranch in Catron County, New Mexico. The record fails to disclose when Antonio Barela died, although the body was found on the early morning of February 8, 1956. On the morning of February 9, 1956, Guile Luna, an employee of Hubbell Company, went to Valencia, New Mexico, where appellants lived, and notified Melquides Barela of his son's death. There was some conversation as to taking the body to a mortuary, but the father requested that the body be brought to the family home. The decedent's body was seen between February 8th and 11th by Robin Todd, then an employee of Hubbell Company, and who assisted in transporting the decedent's body from the sheep camp where he died to the Barela home, arriving there on February 11, 1956. Todd could not recollect whether there were any marks, cuts or bruises on the body. At the sheep camp the decedent's frozen body was wrapped in a tarpaulin, two straps were placed thereon, and the body was then placed on a burro in a bending position and tied down to hold it on. The weather was clear but there was deep snow and it was difficult to travel. The terrain was rugged, very hilly, and there were trees, brush and rocks. Todd had two men go along on the sides to try to keep the body balanced. The snow was 16 inches to 3 feet deep and the trip from the sheep camp to the Jeep, a distance of two miles, took two or three hours. When the parties arrived at the Jeep, a bedroll which was in the Jeep was unrolled and the body, still wrapped in the tarpaulin, was placed on top of the bedroll and transported in the Jeep to appellees' "Y" Ranch, a distance of approximately 20 miles. The trip was made from four o'clock in the morning until approximately five or six o'clock in the evening. An inquest was held on the body.

The following morning, February 11, 1956, at approximately four o'clock, the body of the decedent was placed in the trunk of a 1955 Chevrolet automobile. There were no loose tools in the trunk of the car except a jack and bolt wrench which were behind the tire in the position where the jack is kept. The body, which had been partially doubled, was carefully placed in the trunk of the car with the feet in the area toward the front. The car was then driven to Datil, New Mexico, and then on to the Barela home, arriving at about eleven o'clock that morning. The road was icy, slick, rough and very dangerous and chains were used until they reached Datil, where they were removed. The distance from the "Y" Ranch to the Barela home in Valencia is approximately 100 to 120 miles.

The evidence discloses that the body of the deceased, wrapped in a tarpaulin and

tied with a leather belt, was in the trunk of appellees' car, folded at the middle of the waist in a kind of "U" shape. One witness states that the head of decedent's body was against the spare tire, while the State Policeman, Manuel Otero, testified that the body was not braced against any part of the trunk. Still another witness, Leroy Perea, testified that decedent's head was laying on top of the spare tire. Typical of the testimony is that of Dr. Fred Strickland, an osteopathic physician practicing in Belen, New Mexico, who testified that he was called to the Barela home on the morning the decedent's body was brought there. He saw the body in the trunk of the car "in a position, the only way that anybody could place a body in an automobile trunk, and it was wrapped in a tarpaulin, and then the tarpaulin was tied at both ends." Dr. Strickland helped remove the body from the trunk and transport it into the house where he removed the tarpaulin. The body was frozen and in a bent position. On the right temple there was "just a cut and just a very, very small scratch, or there was sure evidence of possibly a scratch." The scratch over the right eye was approximately one inch long and had dry blood on it. He did not pay any attention to the tarpaulin and there was not much blood. He further testified that after riding such a distance, the face had become contorted a little and it was discolored as a result of the freezing and the time elapsed since death. The color of the face was blue. Rigor mortis had stiffened the body within a few hours. There was no blood on the body with the exception of the scratch on the temple. The doctor was in the process of cleaning the body and had it fairly well cleaned when Mrs. Barela was brought in and saw the body.

Melquides Barela, father of the deceased, age 64, testified that on February 9, 1956, Guile Luna, an employee of Hubbell Company, came to the Valencia school where he was working and notified him of his son's death. He further testified: "Guile told me that my son had died. Then right there, Guile told me that what I said, the boy had died. Guile told me, 'Now you think about this: If you want to for us to take him to the mortuary.' * * * And then I told him I wanted them to bring him out to my house." He further testified that he saw his son's body in the trunk of the car and saw some kind of tools there but did not know what they were. The body was curled up and crooked and he observed what he termed to be a blow on the side of his forehead and the body was purple all over.

Appellants claim error on the ground that the evidence of record, viewed in the light

most favorable to appellants, together with all logical inferences reasonably deducible therefrom, raises a genuine issue of fact for determination by the jury, and that the court erred in directing the jury to return a verdict for the defendants and giving judgment thereon.

The prevailing rule is that there is a quasi-property right in a dead body vesting in the nearest relatives of the deceased, arising out of their duty to bury their dead, and the right to maintain an action to recover damages for any outrage, indignity, or injury to the body of the deceased. Infield v. Cope, 58 N.M. 308, 270 P.2d 716. In the Infield case we stated that survivors have the following rights in relation to the bodies of their dead, to wit: (1) The right to the custody of the body; (2) the right to have the body in the condition in which it was left by death, without mutilation; (3) the right to have the body treated with decent respect, without outrage or indignity thereto; and (4) the right to bury the body without interference.

The record fails to disclose the wilful and wanton conduct alleged and attributed to appellees by appellants. Appellants were not denied the custody of the body and at the time appellees notified appellants of their son's death, the suggestion was made that they should consider whether appellees should take the body to a mortuary. Decedent's father, Melquides Barela, requested that the body be brought to his home and this was done.

There is no evidence of the wilful and wanton mutilation of decedent's body. See People v. Bullington, 27 Cal.App.2d 396, 80 P.2d 1030, 1032. The circumstances surrounding the finding of decedent's body, the difficulty in bringing the body out of the rough terrain and the methods used, have heretofore been detailed. Dr. Strickland, the osteopathic physician, testified he saw the body of decedent wrapped in a tarpaulin with the body bent over at the waist, in the only position that a body could have been placed in an automobile trunk. He further testified that there was a cut or small scratch about an inch long on the right temple, and that there wasn't much blood. He had cleaned, or partly cleaned, the body after it was taken inside the home and before it was seen by the mother, Antonia Barela.

In no manner does the evidence show that appellees' conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency. The record does not sustain appellants' claim that the body was stuffed in the trunk of the car. Under the difficult and unpleasant circumstances disclosed by the record, we cannot say that decedent's

body was subjected to disrespect, outrage, or indignity. There is evidence tending to prove appellees' decent respect. An inquest was held: appellees' employee went to Valencia, where appellants lived, and notified decedent's father personally of his son's death. Appellees' employee suggested the possibility of avoiding the unpleasantness of the situation by asking Melquides Barela to consider whether the body should be taken to a mortuary. The body of a deceased person, who has been dead four days or more, is even under the best of circumstances a gruesome and unpleasant sight, and particularly so to the parents of the deceased.

We cannot help but sympathize with appellants, but under all of the circumstances, as disclosed by the record, we cannot say that appellees' conduct was wilful and wanton, and the learned trial judge was not in error when he directed a verdict for appellees at the close of appellants' case in chief.

Finding no error, the action of the district court is affirmed.

It is so ordered.

COMPTON, C. J., and CARMODY and MOISE, JJ., concur.

NOBLE, J., not participating.